IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 33276-4-III |
| J.L. Q-R; J.N. Q-R. | ) | (consolidated with 33277-2-III) |
| | ) | |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

FEARING, C.J. — The trial court entered a dependency order removing three

daughters from their home after the two oldest daughters accused the father of sexual

abuse and the mother denied the accusation of abuse. Upon entry of the dependency

order, the trial court ordered the State of Washington to provide the mother mental health

counseling and therapy with a Spanish-speaking counselor for the purpose, in part, of

convincing the mother to believe abuse occurred. The mother speaks only Spanish. The

State ignored the order and assigned a retired male police officer, who spoke only

English, to counsel the mother. The State then sought to terminate the mother's parental

rights to the two younger daughters. We reverse the parental termination order because of the State's violation of the dependency order.

## FACTS

This appeal concerns the Quijano family. The father and mother are Juan and Inez Quijano. Juan and Inez are the biological parents of three daughters: Hannah, born in 1998, Julie, born in 2000, and Jacinta, born in 2007, and two young sons: Karl, born 2003, and Jesus, born 2011. Inez appeals from the trial court's termination of her parental rights to her daughters, Julie and Jacinta. All names are fictitious. This factual statement comes from the parental termination trial.

Both Juan and Inez Quijano grew up in Central America and speak only Spanish. Inez never attended school. At the time of trial, Inez Quijano lived in Wenatchee with her two sons. Juan Quijano no longer occupied the family home. The three daughters lived in a foster home in Chelan.

The State of Washington removed Hannah, Julie, and Jacinta from the Quijano home on August 19, 2013, because the two oldest daughters alleged their father sexually abused them. Neither parent had any prior history with Washington's Child Protection Services. After the removal, the State filed a dependency action for all three daughters.

Inez Quijano denies that any of her daughters told her, before their removal from the family home, of sexual assault. Nevertheless, both Julie and Hannah reported that they recounted the abuse to their mother, that Inez confronted the father about the abuse,

2

No. 33276-4-III (consolidated with 33277-2-III)
*In re Parental Rights of J.L.Q.-R.; J.N.Q.-R.*

and that the abuse then ended. The abuse ended one year before the first report to authorities of molestation. In August 2013, Chelan County law enforcement arrested Juan Quijano for child rape, but the State never prosecuted him after his release. He sat in jail for three days.

On August 19, 2013, the same day as the removal of the daughters from the Quijano home, Inez Quijano separated from Juan. Inez has not seen Juan since. Juan has not returned to the home since. He has had no contact with his daughters. The State entered a default order of dependency against Juan, and Juan never participated in services during the dependency proceeding. Because of her view of God, Inez does not consider divorce an option.

The State deemed Inez Quijano's only parental deficiency to be neglect and failure to protect her daughters. The State found no other deficiencies during the dependency action.

On December 2, 2013, the trial court entered orders of dependency for all three daughters as to Inez. The orders with regard to Julie and Jacinta read, in part:

> [X] Services for the parents/guardians/legal custodians entered pursuant to RCW 13.34.130 . . .
>
> . . . .
> [X] as follows: As set out in the attached "Settlement proposal-[Hannah, Julie and Jacinto] - 11/27/13" : follow recommendations of psychological evaluation[.]

Ex. 2 at 7. The settlement proposal attached to the order of dependency declared:

3

A hearing will be set on March 5, 2014, in the above-named dependency cases, at which time an order may be entered which places the child(ren) in the mother's home, if the following conditions are met:

1. Mother [Inez] has participated in *mental health counseling with a Spanish-speaking provider*, who will include in *therapy* information on recognizing the signs/symptoms of victims of sexual abuse;

2. [Inez] has participated in the mental health counseling of her daughters [Hannah], [Julie] and [Jacinto] at Children's Home Society on a weekly basis, as recommended by the children's counselor(s); and

3. The providers of counseling/therapy in nos. 1-2 above report that [Inez] has made progress and that there are no concerns for the safety of the child(ren) if returned to the mother's home under court supervision.

Ex. 2 (emphasis added).

The orders of dependency directed the State of Washington to provide and Inez Quijano to engage in individual therapy, family counseling, and psychological evaluation. The State offered the services to increase Inez's understanding of sexual abuse and to prepare a safety plan so abuse would not reoccur. The State, however, did not consider development of a safety plan a service. According to John Plotz, the State caseworker assigned to the Quijano case, Inez Quijano completed all services and was cooperative. Inez, without any order, also completed a parenting class. The parenting class taught Inez how to speak and draw close to her daughters. Inez periodically visited with her daughters, and no problems arose with visitation.

At the request of the State, Inez Quijano obtained a protection order against her husband that precluded his contact with her and the family. The State told Inez she needed to obtain the order in order to regain custody of her children. The safety plan

4

included the order. The language of the petition for the protective order and the order was English, but translated to Inez in Spanish. Inez's attorney placed in the petition, signed by Inez, the following language: "Ms. [Q] has expressed her beliefs that the alleged abuse did not occur but is willing to get a protection order and comply with the protection order to have her daughters placed in her home." Ex. 15 at 5, 6.

On November 19, 2013, Dr. John Fishburne, a Wenatchee psychologist, performed a psychological evaluation, at the request of the State, of Inez Quijano. Fishburne does not speak Spanish. When performing an evaluation, Fishburne usually takes a history, performs a diagnostic interview, conducts intelligence or cognitive testing, and prepares a personality assessment. Because of a language barrier, Fishburne only performed, through a translator, a diagnostic interview of Inez. He "hoped" this limited evaluation would be reliable.

When speaking with John Fishburne, Inez Quijano spoke only in a positive light. During the interview, Inez was cooperative, pleasant, often tearful, intense, sincere, and never defensive directly. She reiterated her daughters were good and her husband could not have abused the daughters.

Dr. John Fishburne diagnosed Inez Quijano with an adjustment disorder and personality disorder, not otherwise specified. As a result of his diagnosis, Dr. John Fishburne recommended that the State provide Inez therapy, parenting classes, and later in home services if the State returned the daughters to their home. Dr. Fishburne believes

that Inez and the dependency process would have benefitted from a psychologist who spoke Spanish, rather than him, performing the psychological evaluation. Fishburne desired the State to appoint, for Inez, a Spanish-speaking counselor who understood her background and culture.

The State of Washington assigned a white male, Michael Magnotti, to counsel Inez Quijano. Magnotti has been a mental health and relationship counselor since 2006. He served as a Wenatchee police officer from 1986 to 2006. The State asked Magnotti to help Inez understand the sexual abuse so that she would cooperate in forming a safety plan for her daughters to return home. Magnotti believed the father abused the daughters.

Michael Magnotti counseled Inez Quijano on eighteen occasions from December 2013 to April 2014. Magnotti does not speak Spanish and employed an interpreter to speak with Inez. Magnotti does not believe that having an interpreter impeded his ability to provide Inez with mental health services because Inez never said "I don't understand" or "the translation's bad." Report of Proceedings (RP) at 169.

During the counseling of Inez Quijano, Michael Magnotti never developed a rapport with Inez. Michael Magnotti believes he was not the best counselor for Inez. In the end, Inez insisted her husband was innocent and that her daughters lied, used drugs, and were misinfluenced by others. Magnotti quit counseling sessions because of an impasse. He provided no therapy to Inez.

6

According to State caseworker, John Plotz, the State of Washington recognizes merit to assigning Spanish-speaking service providers to monolingual clients. During trial and on direct examination, Plotz testified to an absence of Spanish-speaking psychologists in the Wenatchee area or surrounding regions. He did not identify the geographic area included in the surrounding regions. On cross-examination, John Plotz corrected his testimony and stated that the State had no Spanish-speaking psychologists on contract in this area. He further testified the State was "bound by the contract." RP at 194. He did not specify what he meant by "the contract," nor testify why the State was bound by a contract. RP at 194.

Mackenzie Miller, at Children's Home Society in Wenatchee, counseled Hannah and Julie individually once a week for one hour from September 2013 to September 2014. Miller diagnosed each daughter with posttraumatic stress disorder because of each's respective history and symptoms. She directed the girls to write a narrative about how the abuse felt and their resulting struggles. Miller taught each girl ways to keep herself safe. Julie and Hannah expressed dismay with the little contact they had with their brothers. Miller deemed a relationship with the brothers as important for the girls' health. Hannah and Julie had earlier provided some of the parenting for the boys.

Mackenzie Miller engaged in family therapy with Inez, Hannah, and Julie Quijano two or three times in late 2013 or early 2014. Miller warned the two daughters in advance that discussing the sex abuse with the mother would not help because of the

7

mother's denial. Both girls wanted to voice their concerns anyway to their mother with Miller present. During one or more sessions, Inez Quijano insisted that no abuse occurred and that the daughters were lying. She cried when the allegations were discussed. Inez refused to participate in preparing a safety plan in the event the father suddenly returned home. In the end, Miller deemed the sessions partly productive in that the daughters expressed themselves and she had prepared the daughters for their mother's response.

Edith Pasion, also a counselor at Children's Home Society, provided counseling for the youngest daughter, Jacinta, beginning in September 2013. Jacinta encountered distress when first placed in foster care because of missing her mother and her father being in jail. She experienced nightmares, hid in closets, wet her bed, and cried often. Pasion diagnosed Jacinta with posttraumatic stress disorder. According to Pasion, the disorder could have resulted from being removed from her mother. Jacinta improved with therapy. Pasion is fluent in Spanish and also translated for Inez Quijano when Mackenzie Miller provided family counseling.

The two brothers, who reside with Inez Quijano, miss their sisters.

PROCEDURE

On October 30, 2014, the State petitioned to terminate Juan and Inez Quijano's respective parental rights to Hannah, Julie, and Jacinta. The State later terminated Juan's rights by default. The trial to terminate Inez's rights to her daughters proceeded on

8

March 9, 2015, and lasted one day. At the start of trial, the State dismissed the termination petition for the oldest daughter, Hannah.

During trial, the State called Inez Quijano, Mackenzie Miller, Mike Magnotti, John Fishburne, Edith Pasion, John Plotz, and guardian ad litem Marge Littrell as witnesses. Inez Quijano testified through a translator. Inez Quijano called no witnesses.

During Inez Quijano's testimony, the State of Washington asked her whether she would prevent her husband Juan from returning to the home, with or without a court order. Inez responded that the judge controlled whether Juan could return home. She affirmed that her husband did nothing wrong, but she would not revoke the protection order so that she could keep custody of her daughters.

During her testimony, Inez Quijano insisted that she participated in all services required. She declared that she would protect her daughters.

Social worker John Plotz testified at trial that the services provided by the State did not correct Inez Quijano's parental deficiencies. He did not know of any other service the State could provide to correct the deficiencies when she continued to deny the abuse. Plotz averred that there is no likelihood that conditions will change such that the children can return to their mother in the near future.

During the direct examination of John Plotz, the trial court asked defense counsel if he intended to object to the leading questions that the State's counsel posed Plotz. The court commented that the State's attorney is "doing all the testifying." RP at 191.

9

During cross-examination, John Plotz admitted that, to his knowledge, Juan Quijano has not attempted to contact the daughters. He expressed, however, a concern that the husband might return to the home.

During trial, psychologist John Fishburne testified Inez Quijano's rigidity created a barrier to services. This rigidity also compromised her ability to parent. Unless Inez Quijano recognized abuse occurred, additional services would be futile. At the same time, Fishburne averred that Inez would benefit by therapy specifically targeted to her and by a counselor who spoke Spanish. He agreed that a child of a parent with a personality disorder can lead a productive life.

During trial, counselor Michael Magnotti insisted that Juan Quijano abused his daughters. Also, without Inez admitting to the abuse, he would not recommend the return of the daughters. Magnotti would not concede the possibility that the daughters lied.

Therapist Mackenzie Miller testified that Hannah, Julie, and Jacinta would not be safe if they returned home because of a lack of trust in their mother and an inability to speak with their mother. Miller opined that Inez Quijano cannot protect her daughters without admitting to the abuse that occurred.

During trial, the State asked Edith Pasion, Jacinta's counselor:

> Q: . . . Given what we've discussed today, Ms. Pasion, do you have an opinion as to whether it would be safe for [Jacinta] to return home at this point?
> A: (no audible response)
> Q: Or in her best interest?

10

A: At this point in time . . . You know, this is a difficult answer. Question to answer. It is and it isn't because I did part of the family and I know that mom loves her children, but *I think my place today is to advocate for [Jacinta]* and for her best interest and her safety and her wellbeing, and my response, based on what I've answered so far, would be no.

RP at 92 (emphasis added).

During her testimony, Edith Pasion opined the girls should not be returned home unless the mother takes their side. She later limited this opinion to only the two oldest daughters, not to Jacinta. She also wanted to be assured one hundred percent that dad would not return home. Pasion first averred that all Quijano daughters, if returned home, would continue to be traumatized by what previously occurred. On cross-examination, she conceded Jacinta would not suffer continuing trauma since she never reported any trauma to her. Pasion could not answer the question of how long the father must be gone for her to conclude he will not return. She did not know why the court could not prepare a safety plan for the children to return home. Pasion added that Jacinta is bonded with her foster mother. She worried that, if Jacinta's father or another man abused her, the mother would not believe a report of abuse.

Guardian ad litem Marge Littrell recommend that parental rights be terminated with Julie and Jacinta. She would not recommend the children return home without Inez Quijano agreeing the abuse occurred.

11

The trial court granted the State's petition and terminated Inez Quijano's rights to Julie and Jacinta. The court entered the following findings of fact with respect to each daughter:

> 2.12 <u>Services Offered or Provided</u>. All services ordered pursuant to RCW 13.34.130, and RCW 13.34.136, and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided.
>
> 2.12.1 The services ordered for the mother were a psychological evaluation, participation in individual therapy, and participation in therapy with the children. The mother completed these services. Visitation is not a service, however the mother did attend all visitation. The mother completed parenting education classes.
>
> . . . .
>
> 2.12.3 There are no other services that have been identified or requested that are reasonably available and capable of correcting the parental deficiencies within the foreseeable future. The department made all reasonable efforts to remediate the parental deficiencies.
>
> 2.12.4 The mother did not request or identify any additional services. The mother argues that Spanish speaking providers would have been preferable. The mother argues that female providers would have been preferable, specifically referring to the individual counseling provided to her by Mike Magnotti. The department is limited to contracted service providers and cannot pick the best providers in every case. There is no evidence that Spanish speaking providers were available. There is no evidence that a female counselor was available to provide counseling services. There is no evidence that Mike Magnotti provided inadequate services. There is no evidence to support that a different result would have been reached if Spanish speaking or female service providers were available. Mr. Magnotti testified that after several months of working with the mother no progress was made. Mr. Magnotti's position that no progress was made is no different than the experience of all other service providers in the case, the case worker, the Guardian ad Litem and the Court in interacting with the mother.

CP at 85-86. Other important findings are in an appendix.

12

No. 33276-4-III (consolidated with 33277-2-III)
*In re Parental Rights of J.L.Q.-R.; J.N.Q.-R.*

## LAW AND ANALYSIS

Inez Quijano contends, among other assignments of error, that the trial court erred in finding that the State fulfilled its statutory obligation to provide all necessary services reasonably available and capable of correcting her parental deficiencies. She argues that the State failed to offer mental health services tailored to her specific needs because the State only offered her counseling with monolingual English-speaking providers. Inez maintains that her only hope of reunification with her daughters was to obtain sufficient insight to overcome her unqualified denial of her daughters' allegations and she could not achieve that level of insight with the providers to whom the State referred her. We agree. The State violated its obligation to provide services when it failed to obey the dependency order's directive to provide Spanish-speaking services and to provide therapy. The State also violated its duty when failing to deliver services personalized for Inez's needs.

A parent's right to control and custody of her children is a fundamental civil right. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011). As the United States Supreme Court observed:

> The fundamental liberty interest of natural parents in the care,
> custody, and management of their child does not evaporate simply because
> they have not been model parents or have lost temporary custody of their
> child to the State. Even when blood relationships are strained, parents
> retain a vital interest in preventing the irretrievable destruction of their
> family life. If anything, persons faced with forced dissolution of their

13

parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs.

*Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

In Washington State, termination of parental rights entails a two-step process. *In re Welfare of C.B.*, 134 Wn. App. 942, 952, 143 P.3d 846 (2006). First, the State must show that six statutory requirements under RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). This means the State must show that the relevant ultimate facts in issue are "'highly probable.'" *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Second, the State must show by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(1)(b); *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

Inez Quijano focuses on the fourth of the six initial statutory requirements, the State's provision of services needed to correct deficient parenting skills. When the State seeks to terminate a parent's rights, it must show, in part, by clear, cogent, and convincing evidence:

> That the services *ordered* under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

14

RCW 13.34.180(1)(d) (emphasis added). Under this statute, the State must provide all court-ordered and necessary services to the parent. *In re Dependency of D.A.*, 124 Wn. App. 644, 650-51, 102 P.3d 847 (2004). To meet its statutory burden, the State must tailor the services it offers to meet each individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001).

In addition to the services ordered by the court in the dependency order, the State must identify the necessary services in a permanency plan within sixty days of the child's removal from the home. RCW 13.34.136(1). Moreover, and most relevant to this appeal:

> The supervising agency or department *shall* provide all reasonable services that are available within the department or supervising agency, *or within the community*, *or* those services which the department has existing contracts to purchase. It shall report to the court if it is unable to provide such services.

RCW 13.34.136(2)(b)(vii) (emphasis added).

In seeking to terminate Inez Quijano's parental rights, the State disingenuously suggests that it need only offer services to parents through providers who hold contracts with the State. DSHS social worker John Plotz testified that Spanish-speaking providers were available in the region, but that DSHS could not refer Inez to them because they were not contracted with the State. RCW 13.34.136(2)(b)(vii) directs otherwise. The statute commands that DSHS "shall" provide all reasonable services, and those services are not limited to those providers with whom DSHS has an existing contract. The statute

15

expressly reads that the "department *shall* provide all reasonable services that are available within the department or supervising agency, *or within the community*, or those services which the department has existing contracts to purchase." RCW 13.34.136(2)(b)(vii) (emphasis added). Note that the disjunctive "or" separates those services within the community and those services for which the State has existing contracts.

The State of Washington also ignores the dictate of RCW 13.34.180(1)(d), which demands that "the services *ordered* under RCW 13.34.136 [be] . . . expressly and understandably offered or provided." (Emphasis added.) The statute provides no excuse to the State to avoid providing services ordered but not available with providers under contract. Washington decisions repeat the obligation to provide ordered services. The State must provide all court-ordered and necessary services to the parent. *In re Dependency of D.A.*, 124 Wn. App. at 651 (2004). The statute expressly requires both that all services *ordered* have been provided, *and* that all *necessary* services reasonably available have been provided. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 200, 108 P.3d 156 (2005).

The State violated its duty by failing to provide counseling and therapy to Inez Quijano with Spanish-speaking providers. The dependency order expressly directed Inez to complete "mental health counseling with a Spanish-speaking provider." Ex. 2 (Settlement Proposal (revised)). The order's section on services, with the attachment to

16

the order, directed the State to provide "*mental health counseling with a Spanish-speaking provider*, who will include in therapy information on recognizing the signs/symptoms of victims of sexual abuse." Ex. 2 (Settlement Proposal (revised)) (emphasis added).

We find the State's view that it need not obey a court order disconcerting. All other individuals and entities must obey court orders. The State should be the first to obey. As Justice Brandeis wrote eight-eight years ago, the State is "the omnipresent teacher" that "[f]or good or ill, teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (J. Brandeis dissenting) *overruled in part on other grounds by Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) *and Berger v. New York*, 388 U.S. 41, 87 S. Ct. 1873, 18 L. Ed. 2d 1040 (1967). The State's demand that Inez Quijano follow the court dependency order in order to regain custody of her daughters is hypocritical when it ignores the same order.

The State's own testimony supported the need for counseling and therapy in the Spanish language. John Plotz testified that the State prefers Spanish-speaking providers when a parent is monolingual. Dr. Fishburne testified that he forewent portions of his psychological assessment of Inez because of language barriers. While Dr. Fishburne testified that his limited evaluation did not affect his diagnosis of Inez, he admitted that he normally conducts the omitted tests when completing an intake session with a client.

17

No. 33276-4-III (consolidated with 33277-2-III)
*In re Parental Rights of J.L.Q.-R.; J.N.Q.-R.*

Dr. Fishburne also recommended to the State that therapy and counseling of Inez be performed in Spanish. Michael Magnotti, who speaks no Spanish, never developed a rapport with Inez Quijano.

The State providers acknowledged that Dr. Fishburne and Mike Magnotti, two Caucasian, male, monolingual English-speaking United States citizens, were not the ideal providers for Inez, a Salvadoran, female, monolingual Spanish-speaking immigrant. The American Psychological Association (APA) would agree. The APA notes in particular:

> Research on culturally adapted interventions indicates that interventions in clients' native languages are more effective than those conducted in English, culturally adapted interventions are more effective than those not targeted to specific cultural groups, and ethnic matching in the therapeutic dyad is likely to improve client retention and therapeutic outcomes.

AM. PSYCHOL. ASS'N, WORKING WITH IMMIGRANT-ORIGIN CLIENTS: AN UPDATE FOR MENTAL HEALTH PROFESSIONALS 8 (2013), http://www.apa.org/topics/immigration/immigration-report-professionals.pdf. In some instances, a lack of cultural competency can lead to misdiagnosis or overpathologization of immigrant clients. *See also* AM. PSYCHOL. ASS'N, CROSSROADS: THE PSYCHOLOGY OF IMMIGRATION IN THE NEW CENTURY 32-33 (2012), http://www.apa.org/topics/immigration/immigration-report.pdf.

Eastern Washington has a particular need for the State of Washington to offer Spanish-speaking services to Hispanic parents. As of the 2010 United States census, 25.8 percent of Chelan County, Inez Quijano's home county, were Hispanic or Latino. Other

18

eastern Washington counties have large and economically essential Hispanic populations: Douglas County 28.7 percent; Grant County 38.3 percent; Yakima County 45 percent; Franklin County 51.2 percent; and Adams County 59.3 percent. Of course, not all Hispanics are monolingual Spanish. We have no statistic as to the number of monolingual Hispanics in Washington State or eastern Washington, but nine percent of Hispanics nationwide are monolingual. Many English-speaking Hispanics view Spanish as their first language and converse more comfortably in the Spanish tongue.

John Plotz's testimony that the State had no Spanish-speaking psychologists under contract lacks plausibility. Spanish-speaking Edith Pasion provided services for Jacinta. The State does not explain why Pasion could not be available to provide services to Inez. The State may not wish the same counselor to counsel both the mother and the daughter, but the State never provided evidence of this desire and following the court order should have assumed precedence over such a wish.

If a Spanish-speaking counselor was not available, the State should have known of this unavailability before entering the dependency order and objected to any language requiring the Spanish speaker. At the least, the State should have notified the trial court of the unavailability of Spanish language services long before filing the termination petition and asked for a modification to the dependency order. The last sentence of RCW 13.34.136(2)(b)(vii) demands that the State report to the court if it is unable to provide ordered services.

19

The State also violated the dependency order by failing to provide Inez Quijano therapy. The December 2, 2013, order directed the State to provide mental health services that "will include *in therapy* information on recognizing the signs/symptoms of victims of sexual abuse." Ex. 2 (Settlement Proposal (revised)) (emphasis added). The order further directed the "[t]he providers of counseling/therapy in nos. 1-2 above report that [Inez] has made progress and that there are no concerns for the safety of the child(ren) if returned to the mother's home under court supervision." Ex. 2 (Settlement Proposal (revised)). Mike Magnotti testified that he provided counseling, but not therapy. Dr. John Fishburne diagnosed Inez with a personality disorder, which is a psychological condition highly resistant to treatment and more alterable with therapy, rather than merely counseling.

The dependency order like the psychological profession recognizes a distinction between counseling and therapy. On the one hand, counseling services denote short-term treatment for clients with a specific and immediate need such as improving relationships, alleviating stress, or changing a lifestyle. A counselor focuses on the present tense. Therapy consists of all the components of counseling with additional services. Therapy connotes a longer duration of assistance and addresses the client's extended past. The therapeutic process helps the client to find the root causes of emotional and behavioral patterns. Therapy explores one's past in order to gain more understanding about one's moods, feelings, and ways of thinking. Since therapy addresses root causes, therapy

20

would have better assisted Inez Quijano in understanding the nature of sexual abuse and in recognizing the need to be supportive of her daughters when they speak of abuse.

The State may contend that Mackenzie Miller, when meeting with Hannah, Julie, and Inez Quijano, provided group therapy. Miller never characterized her counseling sessions with all three present as therapy. Any such therapy was not individual therapy for Inez Quijano or focused on her needs. The dependency order required individual therapy, and the trial court found, in finding 2.12.1, that the order of services included individual therapy.

The State also breached its duty to tailor the services it offered to meet Inez Quijano's individual parental needs. Dr. John Fishburne testified that Inez needed a provider who was culturally competent and capable of providing treatment specifically targeted to sexual abuse. Counselor Michael Magnotti may have possessed the latter qualification, but even he admitted that he lacked the former characteristic.

We affirm the trial court's findings in a parental rights termination proceeding so long as they are supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent and convincing evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Whether substantial evidence exists to support the superior court's findings is measured in light of the "highly probable" test. *In re Welfare of Carpenter*, 21 Wn. App. 814, 816, 587 P.2d 588 (1978). Under that test, the evidence must be more substantial than in the ordinary civil case in

21

which proof need only be by a preponderance of the evidence. *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). The evidence establishes a "high probability" when permanent deprivation is necessary for the physical and mental welfare of the child. *Carpenter*, 21 Wn. App. at 816.

The trial court found that the State expressly and understandably offered or provided all ordered services. The undisputed evidence shows otherwise. No Spanish-speaking service providers assisted Inez Quijano.

The trial court found that the State is limited to contracted service providers and cannot pick the best providers in every case. The trial court also found that Spanish-speaking providers were unavailable. The first finding is more in the nature of a conclusion of law because the court ruled that the department need not seek services from providers not under a contract. As explained above, this legal premise is erroneous. We hold that the second finding is not supported by substantial evidence. The trial court likely based its finding on the presumption that Spanish-speaking services were available only if the State had a contract with a Spanish-speaking provider. This presumption is false. John Plotz testified that Spanish-speaking providers were available in the Wenatchee region, but not under contract. Edith Pasion provided Spanish-speaking counseling. Regardless, the lack of availability of a Spanish-speaking counselor and therapist is immaterial, since the dependency order directed services be provided in Inez Quijano's language.

The trial court, in its findings of fact, never addressed whether the State provided therapy to Inez Quijano or whether the State tailored services to Inez Quijano's needs. The undisputed evidence supports the conclusion that the State breached these obligations to provide services. In short, the State failed to prove compliance with RCW 13.34.180(1)(d) by clear, cogent, and convincing evidence.

## Futility of Services

If the State fails to provide all necessary services, but the evidence in the record nonetheless shows that such services would not have remedied a parent's deficiencies in the foreseeable future, this court will uphold the termination. *In re Welfare of Hall*, 99 Wn.2d at 850-51 (1983). Stated differently, when the record establishes that the offer of services would be futile, the trial court can make a finding that the State has offered all reasonable services. *In re Welfare of M.R.H.*, 145 Wn. App. at 25 (2008). In light of this principle, the State argues that assigning Inez Quijano a different provider would have been futile because her refusal to recognize or admit the possibility that her husband abused her daughters remained unchanged during the entire eighteen-month dependency and because the evidence showed Inez would make no progress in the foreseeable future. Inez Quijano contends that the record demonstrates that the assignment of Spanish-speaking providers would not have been futile because she was willing to participate in any services necessary to have her children returned. She emphasizes that State witnesses admitted that Spanish-speaking providers would have been preferable.

23

We hold in favor of Inez Quijano with regard to the alleged futility of services for three reasons. First, the record is not clear who the trial court treated as bearing the burden of proving futility or the lack thereof. Second, the trial court never addressed whether individual therapy was futile. Third, we question whether providing services in a monolingual parent's indigenous language should ever be considered futile.

In its appellate brief, the State argues that, in order to prevail, Inez Quijano must provide evidence from the trial record demonstrating how a different provider would have corrected her parental deficiencies. By framing its argument in this language, the State imposes the burden of showing a lack of futility on Inez Quijano. The trial court's findings may echo the State's burden allocation. In findings of fact 2.12.4 to 2.13, the court wrote:

> 2.12.3 There are no other services that have been identified or requested that are reasonably available and capable of correcting the parental deficiencies within the foreseeable future. . . .
>
> . . . .
> 2.12.4 . . . There is no evidence that Spanish speaking providers were available. There is no evidence that a female counselor was available to provide counseling services. There is no evidence that Mike Magnotti provided inadequate services. There is no evidence to support that a different result would have been reached if Spanish speaking or female service providers were available. . . .
>
> 2.13 Potential for Remedial Action. There is little likelihood that conditions will be remedied so that the child can be returned to either parent in the near future.

CP at 85-86.

24

The findings of fact, read as a whole, suggest the trial court considered the State to carry the burden of proof, on clear and convincing evidence, to show ordered or additional services would be futile. Nevertheless, the trial court, in finding of fact 2.12.4, repeatedly wrote that "there is no evidence" to support factual assertions concerning the need for individualized services forwarded by Inez Quijano. This language suggests the trial court imposed on Inez the burden of proof or production to defeat the State's claim of futility.

We disagree with assessing the burden of proof or a burden of production on Inez Quijano. Contrary to the State's framing of the futility doctrine, Inez does not bear the burden of proving anything. *In re Welfare of Hall*, 99 Wn.2d 842 (1983), the first case in which our Supreme Court articulated and applied the futility rule, makes no mention of a parent needing to point to evidence in the record to prove that she would have improved in the foreseeable future had appropriate services been ordered. No case imposes the burden of proof concerning the lack of futility on the parent. Under statute, the State must offer all ordered and necessary services, and the futility doctrine is an exception to the general rule. The State should carry the burden of proving an exception and the yoke of excusing its violation of a court order.

The State failed to provide Inez Quijano individualized therapy with a Spanish-speaking provider, despite the dependency order mandating this service. The State may deny that therapy, and even therapy in the Spanish language, would have helped.

25

Nevertheless, the trial court never entered a finding that therapy would be futile. Instead the trial court failed to recognize that the court previously ordered therapy in Spanish and that Michael Magnotti conceded he provided no therapy.

We question whether services ordered in the parent's only language should ever be found futile. As previously written, the American Psychological Association promotes the need for psychological interventions in the client's native tongue. Therapy, which includes an extensive reach into the client's background, culture, and religion, should particularly be conducted in the client's home language. A Spanish-speaking therapist, with an understanding of Central American culture, could have better empathized with Inez Quijano and broken Inez's barriers to recognizing sexual abuse of her daughters.

Inez Quijano demonstrated a willingness to complete all services and comply with court orders. When reunification depends on one particular factor and the State fails to provide ordered and helpful services to address the factor, the State should not be excused from providing less than optimal service providers on the basis of futility.

Related in nature to the futility doctrine is RCW 13.34.180(1)(e), the fifth of the sixth initial factors in parental termination, which reads, in relevant part:

> That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all

26

necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.

The State argues that Inez Quijano failed to rebut the presumption contained within RCW 13.34.180(1)(e) that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future" because she failed to improve substantially within twelve months of the entry of the order of dependency. Nevertheless, RCW 13.34.180(1)(e)'s rebuttable presumption does not apply here because the State fails to show "that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided." We have already held that the State failed to provide such necessary services.

This appeals raises many issues other than whether the State provided necessary and ordered services. We do not reach these other questions. Inez Quijano may raise the issues again if the State files another petition to terminate her parental rights.

CONCLUSION

We reverse and dismiss the petition to terminate Inez Quijano's maternal rights to Julie and Jacinta. The dismissal is without prejudice in that the State may file another petition after providing services consistent with this opinion.

27

No. 33276-4-III (consolidated with 33277-2-III)
*In re Parental Rights of J.L.Q.-R.; J.N.Q.-R.*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.

28

Appendix

Additional Findings of Facts

2.13 <u>Potential for Remedial Action</u>. There is little likelihood that conditions will be remedied so that the child can be returned to either parent in the near future.

2.13.1 . . . Prior to the dependency being established, throughout the life of the dependency and by her testimony at trial, the mother has refused to acknowledge that the sexual abuse occurred or even to entertain the possibility that the sexual abuse occurred. The mother's unwavering denial that the sexual abuse occurred has been expressed to all service providers, the case worker and the court. The mother testified that she believed her daughters lied about the abuse and that the accusations were the result of "bad influence" on behalf of unidentified friends. The mother testified that her husband could never have committed the abuse and that he was a "good man." The testimony reflects that when confronted about the abuse in group therapy sessions her response was to accuse the child of lying and to continue to deny that the abuse occurred.

2.13.2 The mother's primary current deficiency that prevents her daughters from being returned to her care is her inability to accept that the sexual abuse perpetrated by her husband occurred or even to accept the possibility that the abuse occurred. The court finds that even if a parent had doubts about the accusations, a fit parent would have taken steps to protect the children and make sure the children were safe. The mother did not take the steps a fit parent would take to protect and keep the [sic] her daughters safe. The mother's priority is her husband rather than her daughters.

. . . .

2.13.4 The mother's failure to substantially improve her parental deficiencies within twelve months following entry of a dispositional order has given rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the mother in the near future. The mother has not rebutted the presumption. For [Julie] the near future and foreseeable future is six months to one year. For [Jacinta] the near future and foreseeable future is three months to six months. There is no evidence that conditions would change for the mother over the next twelve months given that nothing has changed in the eighteen months since the children were physically removed from the home. The posture of the case at the time of trial is the same as at the time of removal.

> The court makes an affirmative finding that the mother is currently unfit to parent for all the reasons stated above.
>
> . . . .
>
> 2.17 <u>Best Interests of the Child</u>. The court finds by a preponderance of the evidence that termination of the parent-child relationship is in the best interests of the child. The testimony of the guardian ad litem, the case worker, the psychologist and the therapists support that termination is in the best interest of the child.